UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THUAN VO TRAN, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 12-0999

ABDON CALLAIS OFFSHORE, LLC,             SECTION: "A"(4)
ET AL.

### FINDING OF FACT AND CONCLUSIONS OF LAW

This litigation arises out of a maritime collision between the F/V STAR OCEAN and the M/V ST. JOSEPH THE WORKER that took place on March 1, 2012.  Plaintiffs Trinh Van Tran and Lanh Tran, captain and deckhand, respectively, of the F/V STAR OCEAN, seek damages for personal injuries, past and future lost wages, lost property, and other general damages.  Plaintiff Tran & Peter, LLC seeks to recover the costs of the attempted salvage of the F/V STAR OCEAN, which sank after the collision, and other damages.  Defendant Abdon Callais Offshore, LLC seeks to recover the cost of the spill response incurred as part of the aftermath of the collision.  Intervenor Tom's Marine & Salvage, LLC seeks to recover the amount of a salvage contract entered into with Tran & Peter, LLC.

Defendant Abdon Callais Offshore, LLC, appearing with defendants Captain Jack Sears, Jr. and the M/V ST. JOSEPH THE WORKER, disputes the contention of Plaintiffs that it should be held solely liable for the collision.

The case was tried to the Court, sitting without a jury, on April 20-22, 2015.  Having considered the testimony and evidence at

1

trial, the depositions submitted in lieu of live testimony, the arguments of counsel, and applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).  To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such.  To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

I.    **FINDINGS OF FACT**

    **a.  The Collision**

    The F/V STAR OCEAN ("SO"), owned by Tran & Peter, LLC ("T&P"), was a 77 x 22 foot uninspected fishing vessel of primarily fiberglass construction.  It had a metal rigging made of 4 and 3 inch pipe raised just above the cabin and extending the width of the vessel with lighting and other equipment mounted on it.  The SO also had a radio and two radars as well as a radar reflector.  At the time of the collision, its crew consisted of Trinh Tran, the captain, three deckhands, including Lanh Tran, and one passenger.

    The M/V ST. JOSEPH THE WORKER ("SJW"), owned by Abdon Callais Offshore, LLC ("ACO"), was a 205 x 46 foot inspected supply vessel of primarily metal construction.  It was outfitted with a radio and two radars.  At the time of the collision, its crew consisted of three captains, including Jack Sears who was piloting the SJW immediately before the collision and Captain McDonald who rushed to the controls right before the collision, three deckhands, and two engineers.

    Both vessels were underway on March 1, 2012 at the time of the collision.  The SJW had just entered the Gulf of Mexico via Belle Pass after departing from Port Fourchon and was proceeding at 9 knots on a course of somewhere between 168 and 172 degrees.  The SO was traveling in the Gulf of Mexico towards Southwest Pass via the Houma Navigation Canal after departing from Dulac and was proceeding at 3-4 knots on a course of 110 degrees.

Visibility at the time of the collision was restricted due to fog. However, neither party could establish the specific degree of visibility. The captains of the SJW stated at various points that visibility was maybe 1/4 or 1/8 of a mile and worsening as they proceeded into the Gulf of Mexico. The captain of the SO testified that visibility at the time of the collision was 30 feet. Phuc Vo, who was in the wheelhouse of the SO at the time of the collision, stated that visibility was 7-8 feet. Based on the deposition testimony of the captains, the Court finds that visibility at the time of the collision was between 30 feet and 1/4 of a mile.

The SJW had the SO on its starboard side. The SJW attempted to turn to the starboard and reduce its speed. It struck the center of the SO at a perpendicular angle on the port side of the SO. The crew of the SO evacuated onto the SJW, and the SO sunk shortly thereafter.

Both vessels had radar devices. Neither vessel detected the other on its radar. The SO had its radars set at 1/4 of a mile and 3/4 of a mile; the SJW had its radars set at 3 miles and 6 miles. The SJW regularly broadcasted its position on the radio; the SO did not. Neither vessel sounded foghorns. The SJW did not have a lookout. The SO had a second individual in its wheelhouse, Phuc Vo, at the time of the collision. He was seated to the right of the captain, Trinh Tran. Trinh Tran asked Phuc Vo to keep a lookout to the front and to the right.

**b. Medical Findings**

4

### i. Trinh Tran

At the time of the collision, Trinh Tran was piloting the SO and fell to his left, onto the chair occupied by Phuc Vo.  At the referral of counsel for Plaintiffs, Trinh Tran first went to see Dr. George Murphy, accepted as an expert in orthopaedic surgery, on March 12, 2012 and was continuing to see him at the time of trial. Trinh Tran also continues to take medicine for pain prescribed by Dr. Murphy.  Trinh Tran stated that his work capacity is now only 40% of what it was previously.  Trinh Tran also testified that he has experienced intimacy problems with his wife, has memory problems, becomes agitated more easily with his family members, and can no longer play football and basketball.

On his initial visit to Dr. Murphy, Trinh Tran complained of pain in his neck, lower back and right knee.  As these problems persisted at his second appointment on April 2, 2012, Dr. Murphy recommended MRI scans of Trinh Tran's neck, lumbar spine, and right knee.  Dr. Murphy did not review the actual MRI scans, but he did review the radiologists' reports from those MRI scans.

Regarding the knee, Dr. Murphy noted the presence of some fluid in, or an effusion of, the knee joint, which is indicative of inflammation in the knee.  There was no particular damage to the extensor compartment or the lateral compartment of the knee.  Dr. Murphy noted a tear of the medial meniscus of the knee, which can cause irritation and pain.  Dr. Murphy also noted that an abnormal signal on the MRI indicated a probable partial tear of the anterior

5

cruciate ligament.

On May 16, 2014, Dr. Pamela Petrocy performed arhthroscopic surgery on Trinh Tran's right knee.

Dr. Murphy testified that Trinh Tran continues to experience pain even after the surgery and that the condition in his knee is chronic. Dr. Murphy noted effusion in Trinh Tran's knee in his September 2014 visit. He also stated that the injuries have probably accelerated the arthritis in the knee and that more probably than not Trinh Tran will need knee replacement surgery at some point. Dr. Murphy opined that the collision caused the tear suffered in his right knee.

Regarding Trinh Tran's cervical scan, Dr. Murphy reported that the MRI revealed some disc protrusion at multiple levels but in particular at C5-6 and C6-7 (including some cord deformity). Dr. Murphy noted particular concern with the deformity and said one must look for symptoms in the upper extremities to see if the cord is threatened. Dr. Murphy testified that Trinh Tran did not exhibit any such extremity problems. Dr. Murphy also noted degenerative change at the C6-7 level and opined that such changes usually are caused by long-standing events. He testified that Trinh Tran has bad joints in his neck and that those are causing him pain. Dr. Murphy reiterated this opinion on cross examination by stating that possibly all degenerative changes preexisted the accident, which would not be unusual in a fifty-one year old male who primarily has had jobs consisting of manual labor. He did

6

however opine that, at the very least, the collision would aggravate such conditions.

Regarding the scan of Trinh Tran's lumbar spine, Dr. Murphy noted the radiologist's findings of some spinal stenosis, or narrowing of the canal, in the lower back and a moderate disc bulge at L1-2. On cross examination, he acknowledged that the disc bulge could not be dated. Similar to the cervical scan, Dr. Murphy observed that it was important that Trinh Tran was not experiencing extremity symptoms in his legs. Dr. Murphy remarked that prominent epidural fat, such as that present at Trinh Tran's L2-3 and L3-4, contributes to the spinal stenosis. He testified that while Trinh Tran obviously had the epidural fat before the collision, it does make Trinh Tran more susceptible to pain in his back when aggravated. Dr. Murphy concluded that the collision aggravated Trinh Tran's lower back condition.

Dr. Murphy said restrictions regarding Trinh Tran's knee depend mostly on how symptomatic the knee is at a given time, but that he should not do things that require him to run, go up and down stairs, or climb ladders. He testified that the surveillance pictures of Trinh Tran's activities are not inconsistent with these recommendations. Regarding his neck and back, Dr. Murphy said that Trinh Tran can drive a boat but should not lift more than 40-50 pounds and should be able to change positions frequently. Dr. Murphy testified that Trinh Tran did not tell him during the September 2014 visit that he had returned to work.

7

Dr. Murphy opined that Trinh Tran was approaching maximum medical improvement, but he still had some outstanding medical issues. He testified that he had not looked at the disability ratings, but he said it would probably be about 3 to 5% impairment for the spine and probably about 20-30% impairment for the knee. Dr. Murphy does not see a need at this point for Trinh Tran to have surgery regarding his neck or back.

Trinh Tran also met three times with Dr. Gordon Nutik, accepted as an expert in orthopaedic surgery, at the request of defense counsel. These visits took place at Dr. Nutik's office on November 19, 2012, April 17, 2013, and December 3, 2013. In addition to physical examinations, Dr. Nutik reviewed the MRI scans themselves and also took x-rays of the injured areas on two different occasions. Similar to the opinions of Dr. Murphy, Dr. Nutik noted that the cervical and lumbar issues evidenced in the MRI scans and x-rays are indicative of long-standing problems that likely preexisted the collision. Dr. Nutik acknowledged that the collision could have aggravated the conditions or caused soft tissue strains of those areas, in other words, causing pain by making the conditions symptomatic for a period of time. Dr. Nutik noted that there was no evidence of nerve root impingement. Dr. Nutik testified that he tested for objective indications of issues in his neck or lower back that would indicate permanent aggravation, and he found none. While Trinh Tran complained of some neck and back pain during the first visit, these complaints

had lessened by the second visit.  By the third visit Trinh Tran did not have pain complaints regarding his neck or lower back, and Dr. Nutik thus concluded that those areas were now asymptomatic and that the soft tissue strains or aggravated conditions had been resolved.  Trinh Tran's range of motion remained stable throughout his visits.  Neurological examinations did not show underlying abnormalities on any visit.  Based on all of these factors, Dr. Nutik concluded that there were no clinical indications of permanent disability with Trinh Tran's neck or lower back.

As to the knee, Dr. Nutik found clinical signs consistent with a tear in the medial meniscus.  Regarding the anterior cruciate ligament, he testified that the MRI image was inconclusive but that there were no indications of instability or other clinical correlations to a ligament tear.  He did not see any further deterioration in the right knee after taking a second round of x-rays.  Dr. Nutik testified that he could not say whether Trinh Tran would need a knee replacement since that would depend on deterioration.

Regarding restrictions, Dr. Nutik said that he would have restricted Trinh Tran to sedentary to light level of duty pre-surgery, but that post-surgery he would think that Trinh Tran could do most things around a boat depending on the level of lifting.  He observed that a majority of patients are able to go back to "heavy-duty occupations" after surgery for medial meniscus tears.  Dr. Nutik said that Trinh Tran should not play soccer with his right

knee.  When asked about weight restrictions, he said that the level of lifting depends on rehabilitation, but without a finding of objective disability, there is no reason that Trinh Tran could not lift over 50 pounds.  Trinh Tran told Dr. Nutik that he had not gone back to work.  Surveillance showed Trinh Tran to be more active than he had told Dr. Nutik on either the second or the third visits.

Dr. Petrocy, accepted as an expert in orthopaedic surgery, first met with Trinh Tran on September 30, 2013.  She performed a physical exam and noted that he had "a large effusion and severe tenderness to palpation" around the right knee.  She noted that both can be due to meniscus tears or arthritis.  She reviewed the MRI and diagnosed a torn medial meniscus and degenerative changes. She did not diagnose a partial tear of the anterior cruciate ligament.  Dr. Petrocy recommended the right knee arthroscopy and, after two more visits, performed it on May 16, 2014.  Dr. Petrocy removed a plica band and the meniscus tear.  Dr. Petrocy has not seen Trinh Tran since the surgery.  Trinh Tran has only attended two therapy sessions, although the general therapy recommendation in such cases is 2 to 3 times a week for a month to 6 weeks.

As to the cause of the knee injury, Dr. Petrocy opined that "[s]ince he did not have any symptoms prior to the accident, and the accident's consistent with his injury, I think that it was more probable than not that it did result in the torn meniscus."  She based this opinion on the medical history as given to her by Trinh

10

Tran.  Dr. Petrocy testified that the degenerative conditions preexisted the collision, as they otherwise would have appeared differently.

Although she has not seen Trinh Tran since the surgery, Dr. Petrocy stated that she would not expect him to have any restrictions with regard to the knee itself.  She observed that, generally, a patient will stop feeling pain anywhere from a month to three to four months after the surgery.  Dr. Petrocy also noted that therapy would usually help hasten the recovery.  She testified that Trinh Tran had told her that he was not working.

Finally, the Court notes several surveillance photographs in evidence that show Trinh Tran, both pre and post surgery, engaged in a wide range of activities in a variety of positions.  While the expert testimony was clear that none of these activities were inconsistent with Trinh Tran's injuries, they illuminate the spectrum of his abilities even pre-surgery.

The Court finds that Plaintiff has not established that any disc bulges, protrusions, or other issues noted by the experts as "degenerative" were caused by the collision.  Plaintiffs did establish that the collision caused some level of aggravation or related soft tissue strain of these preexisting conditions.  The Court credits Dr. Nutik's testimony, due to his review of the MRI scans, two rounds of x-rays, and several examinations based on objective indicators, that Trinh Tran has no permanent aggravation or disability as to his neck or back.  There was no evidence of

11

radiculopathy in the extremities or nerve impingement.  Trinh Tran has not had nor is he a candidate for neck or back surgery.

Plaintiffs did establish that the medial meniscus tear was caused by the collision.  Plaintiffs did not establish that there was a tear to the anterior cruciate ligament or that Trinh Tran will need a knee replacement as a result of injuries caused by the collision. While it does appear that Trinh Tran continues to experience some problems with his knee, the Court questions his credibility as to the amount of pain his knee is causing him.  He falsely denied working on several occasions when visiting with the doctors.  Furthermore, Trinh Tran has failed to take action to mitigate or address any continuing knee issues outside of his visits to Dr. Murphy and two therapy sessions as of the date of his trial.  Despite Dr. Murphy's instructions on September 2, 2014 to return to his operating surgeon, Trinh Tran still had not done so as of the date of trial.  Thus, while Dr. Murphy diagnosed a 20-30% impairment of the right knee, this appears to be largely based on Trinh Tran's subjective complaints of pain, which the Court does not fully credit.  The Court also finds that any pain related to the neck and back is only intermittent.  Based on these inconsistencies, the failure to mitigate, and the surveillance photos, the Court finds that Trinh Tran failed to establish any compensable future pain and suffering by a preponderance of the evidence.

Plaintiffs argue that Trinh Tran is entitled to $900,000 in

general damages for all injuries.  Defendants argue that Trinh Tran
is entitled to $35,000 in general damages for his injuries.  Both
agree that Trinh Tran is entitled to $23,789.28 in past medical
expenses.

The Court finds that Trinh Tran is entitled to the following
damages: 1.) $23,789.28 in past medical expenses; and 2.) $100,000
for general damages.

### ii.  Lanh Tran

At the time of the collision, Lanh Tran was sleeping on a top
bunk in the SO's cabin.  He stated that the cabin collapsed on him,
and that his fellow deckhands were able to pull him free.  The
other deckhands helped him to evacuate to the SJW where he received
dressings for his injuries.  Lanh Tran stated that he had injured
his neck, back, head, and leg in the collision.  He reported that
pain from these injuries has caused problems in his relationship
with his family.  He testified that he can no longer work, and he
cannot play the sports that he used to enjoy.

At the referral of counsel for Plaintiffs, Lanh Tran went to
see Dr. Murphy on March 13, 2012 and was continuing to regularly
see him at the time of trial.  Dr. Murphy testified that on the
first visit Lanh Tran came to him with complaints of pain in his
neck, lower back, and left ankle (where he had been cut in the
collision).  Lanh Tran also reported that he struck his head in the
collision.  He had pain in his neck and back but no radiation to
the extremities.  On the second visit, Dr. Murphy noted that Lanh

13

Tran had some radiation to the upper leg, so he recommended cervical and lumbar MRI scans.  Dr. Murphy then reviewed the radiologist's reports based on those MRI scans.

The report of the cervical MRI noted a protrusion at C3-4 and a bulge at C4-5, neither affecting pressure on the spinal cord.  A protrusion at C5-6 was noted as possibly affecting the nerve root; however, Dr. Murphy said one would expect to have radicular pain in the arm, but Lanh Tran had pain only in his shoulder, which could be either radicular or referred.  He noted that the protrusions or bulges at multiple levels are evidence of a preexisting condition.

The report of the lumbar MRI noted a disc bulge at L3-4 with mild spinal stenosis and a bulge at L4-5 that could cause pressure on the nerve roots on either side, which can lead to irritation in the legs.  On cross examination, Dr. Murphy acknowledged that these issues could not be dated to the collision.  Dr. Murphy also noted that in the earlier visits Lanh Tran had some radiation into his upper legs, a symptom which can come and go and is evidence of possible nerve root impingement.

As to both the lumbar and cervical issues, Dr. Murphy concluded that the collision at least aggravated his condition and could have worsened it or even caused some of it.  He noted that the pain in both the neck and back are chronic, and that Lanh Tran's headaches are linked to neck problems.  Lanh Tran is not a candidate for surgery nor has he had any surgery as a result of the collision.  He reached maximum medical improvement on December 10,

2014.

Regarding restrictions, Dr. Murphy recommended that Lanh Tran remain active and not lift anything over 40-50 pounds.  He does not recommend a return to commercial fishing.  Dr. Murphy opined that Lanh Tran suffers from 3-5% permanent impairment of his neck and back.  He stated that the injuries to his left ankle and head were temporary contusions.

In summary, the Court finds that the collision aggravated the conditions of Lanh Tran's neck and back, causing pain.  Lanh Tran suffers minimal impairment in both areas.  Plaintiffs did not establish that the collision caused any protrusions or bulges. Plaintiffs did not establish that Lanh Tran suffers from nerve root impingement.  He has not and will not have surgery related to the collision.  Plaintiffs did establish that the temporary head and ankle contusions were caused by the collision.

The exact extent of any continuing pain or impairment is difficult to determine.  The Court questions the credibility of Lanh Tran regarding the effect of his injuries.

Several surveillance photographs in evidence show Lanh Tran engaged in a wide range of activities in a variety of positions, albeit not ones inconsistent with his injuries.  More importantly however, Lanh Tran appeared to try to mask the extent of his abilities on cross examination.  For example, when asked about his activities in a surveillance photograph in which Lanh Tran is carrying a propane tank or similar cannister, he first tried to

15

explain that he was holding a hose and watering the flowers in the picture.  When the Court asked him further about the item in his hands, he repeated the answer about watering the flowers.  Lanh Tran then changed his story and stated that he was carrying a plastic receptacle for trash.  The Court finds that the pain is not as severe as stated by Lanh Tran.  Based on his diminished credibility, due to the inconsistency of his testimony and the surveillance photographs, Lanh Tran did not establish his future pain and suffering by a preponderance of the evidence.  For these same reasons, the Court also finds that Lanh Tran did not establish that he cannot return to work.

Plaintiffs argue that Lanh Tran is entitled to $620,000 in general damages for all injuries.  Defendant argues that Lanh Tran is entitled to $30,000 in general damages for his injuries.  Both agree that he is entitled to $5910 in past medical expenses.

The Court finds that Lanh Tran is entitled to the following damages: 1.) $5910 in past medical expenses; 2.) $50,000 for general damages.

**c.  Lost Wages**[1]

Plaintiffs argue that Trinh Tran is entitled to damages for

---

[1] In a previous ruling in this case, the Court held that Plaintiffs should use the tax returns of the three previous years as evidence of the actual earnings of the individuals in the overall lost wage calculations instead of relying exclusively on a wage rate derived from statistical studies of individuals in similar positions.  The Court went no further in limiting the parties in their methodology or calculations.

16

lost wages and lost earning capacity in the amount of $1,481,703.00. For support of this contention, they point to the testimony of their expert economist, Dr. Randolph Rice. Dr. Rice used the average net income of Trinh Tran's tax returns for the years 2009-2011, including an amended 2011 return as prepared by Timothy Legendre, CPA, who was also called by Plaintiffs. As opposed to the original 2011 Schedule C, which had listed $116,751 in "Other Expenses," the amended 2011 Schedule C reclassified $81,449 of these expenses as a depreciable capital expenditure due to conversion of a fishing vessel to "long-line" use. While this resulted in the same taxable result as the original 2011 Schedule C, a loss of $57,837, Mr. Legendre counted the entirety of this depreciable amount as a positive gain in calculating Trinh Tran's economic income for 2011, resulting in a profit of $23,662 for that year. To this number, Dr. Rice also added an ATAA / RTAA payment of $25,942. In addition to the Schedule C net income for 2010, Dr. Rice also included $125,000 from the Deepwater Horizon Oil Spill Trust, a $25,000 INA Insurance payment, and a $12,326.05 taxable energy grant from the La. Dept. of Wildlife and Fisheries, all as listed in attendant 1099 forms. Dr. Rice then arrived at an average base earnings of $137,380. Assuming that Trinh Tran has not been able to work since the date of the accident, March 1, 2012, Dr. Rice concluded that Trinh Tran is owed $352,412 in after-tax past wage losses and $1,129,291 in after-tax loss of future earning capacity.

17

Defendants argue that Trinh Tran is entitled to past lost wages of $33,857.07. Defendants base this number on the testimony of their expert economist, Dr. Kenneth Boudreaux. Dr. Boudreaux arrived at this number by first taking the average of Trinh Tran's net income as displayed in his tax returns for 2009-2011. He prorated this amount, $47,458, for the window of time between the date of the accident, March 1, 2012, and the first round of surveillance photographs of Trinh Tran, January 25, 2013, and then subtracted taxes to arrive at a figure of $33,857.07. Dr. Boudreaux did not use the amended 2011 Schedule C nor did he incorporate the alternative sources of income mentioned above.[2]

The Court finds that Trinh Tran was able to return to work as a fishing vessel captain on August 11, 2013. Surveillance photos showed Trinh Tran on a boat on this date, and he admitted that it was a fishing vessel owned by T&P and that he was driving the boat. Thus, the award of lost wages will extend from March 1, 2012 to that date. Plaintiffs did not establish how the collision or injuries affected Trinh Tran's earning capacity or future lost wages. Second, the Court credits the testimony that the conversion of the vessel into a "long-lining" fishing vessel, which the Court

---

[2] For the first time in post-trial briefing, Plaintiffs argue that the Court should not use the numbers listed under "net income" but should instead use the number listed under "gross income" for each and then subtract the lowest figure of expenses from any of the three years to arrive at a base earnings figure. The Court finds no fault with the methodology used by all experts at trial, as the net profit amount represents gross earnings less expenses. The only item remaining is to deduct taxes.

finds was undertaken, is properly classified as a depreciable capital expenditure. However, all experts agreed that the dominant methodology would only add half of that amount back into a calculation of economic income for the given year. Third, Dr. Rice admitted on cross examination that he could not say if the money from INA and Deepwater Horizon were to compensate for lost fishing income. Dr. Rice was not rehabilitated on that point, and Trinh Tran was not asked about it. The Court finds that these amounts should not be used in the calculation of Trinh Tran's lost wages. No one has cited, nor has this Court been able to find, any jurisprudence to the contrary.[3] Based on the preceding, Trinh Tran is entitled to lost wages in the amount of $69,922.25.[4]

**ii. Lanh Tran**

Plaintiffs argue that Lanh Tran is entitled to damages for lost wages and lost earning capacity in the amount of $113,341.00. Dr. Rice arrived at this figure after taking the average of net incomes for 2009-2011, including $12,000 from the Deepwater Horizon Oil Spill Trust and a $9,008 INA Insurance payment. Using these figures, Dr. Rice arrived at an annual base earnings of $22,830.

---

[3] The Court also notes that Plaintiffs do not mention any argument in post-trial briefing that sources of additional income, such as the Deepwater Horizon payments, should be included in the calculation of lost wages for Trinh Tran.

[4] To arrive at this figure, the Court calculated the tax rate used by both experts. As the figures used by Dr. Boudreaux were closer to the figures used by the Court, the Court elected to use the tax rates employed by him. The Court then prorated the amounts and applied the relevant tax rates to arrive at an after-tax number.

Assuming that Lanh Tran has not been able to work since the date of the accident, March 1, 2012, Dr. Rice concluded that Lanh Tran is owed $69,814 in after-tax past wage losses and $43,527 in after-tax loss of future earning capacity, based on a work-life expectancy of 1.98 years from the trial date.

Defendants argue that Lanh Tran is entitled to past lost wages of $16,319.38. Dr. Boudreaux also used the net income figures for 2009-2011. While he included the $12,000 from the Deepwater Horizon Oil Spill Trust, he did not use a figure that included the INA insurance payment. He prorated this amount, $19,827, for the window of time between the date of the accident, March 1, 2012, and the first round of surveillance photographs of Lanh Tran, February 15, 2013, and finally subtracted taxes to arrive at a figure of $16,319.38.

In reviewing the relevant testimony, the Court finds that Lanh Tran could return to work as a deckhand on a commercial fishing vessel as of February 15, 2013. Also, consistent with its finding as to Trinh Tran, the Court will exclude the Deepwater Horizon Oil Spill Trust payment and the INA insurance payment from its calculation of lost wages. Based on the preceding, the Court finds that Lanh Tran is entitled to $13,067.05 in past lost wages.

### d.  Salvage Contracts

Following shortly after the collision and the sinking of the SO, Thuan Vo Tran, co-owner / member of T&P and wife of Trinh Tran, executed a salvage contract with Tom's Marine & Salvage, Inc.

20

("Tom's Marine").

The first contract, signed on March 8, 2012, provides in pertinent part as follows:

> ...
>
> 4. SALVOR'S ONLY OBLIGATION UNDER THIS CONTRACT SHALL BE TO USE ITS BEST EFFORTS TO REMOVE THE SAID VESSEL . . . .
>
> 5. AN INITIAL DEPOSIT OF **20,000.00** DOLLARS U.S. IS DUE AT THE SIGNING OF THIS CONTRACT PRIOR TO THE START OF SALVAGE WORK. THE REMAINING BALANCE OF **120,000.00** DOLLARS U.S. IS DUE AT THE SETTLEMENT OF THE LAWSUIT.
>
> ...
>
> (Ex. 13) (Emphasis in original).

The second contract, signed on March 12, 2012, provides in full as follows:

> THIS AGREEMENT MADE ON THIS **8TH** [*sic*] DAY **OF MARCH 2012** BETWEEN **TRAN THUAN** AND **KHAI "TOM" DINH** ENTAILS IN THE EVENT THE **M/V STAR OCEAN** IS UNSALVAGEABLE, THE SALVAGE CONTRACT

21

> STATES THE AMOUNT TO PERFORM THE SALVAGE IS
> **140,000.00 DOLLARS U.S.**, WITH NONREFUNDABLE
> **20,000.00 DOLLARS U.S.** DUE AT THE SIGNING OF
> THE SALVAGE CONTRACT AND THE REMAINING
> **120,000.00 DOLLARS U.S.** DUE AT THE SETTLEMENT
> OF THE LAWSUIT, IN THE EVENT THAT THE M/V STAR
> OCEAN IS UNSALVAGEABLE, THE AMOUNT DUE TO KHAI
> "TOM" DINH WILL BE **50 PERCENT** OF THE AMOUNT OF
> THE SETTLEMENT OUT OF COURT.

> (Ex. 11, at 290) (Emphasis in original).

Tom's Marine argues that it is due the full amount of the contract, $140,000, less the $20,000 deposit already paid by T&P. Plaintiffs argue that the contract terms are ambiguous, and thus the ambiguity should be construed against Tom's Marine and read as the additional $120,000 coming due only if there is a settlement out of court. Defendants argue that the terms are explicit, should be given their plain meaning, and do not lead to absurd consequences. They contend that the second contract replaced the first, and, as there was no out of court settlement, there is no further amount due. Defendants also note that a "no cure / no pay" contract is common in the event of an unsalvageable vessel. All parties stipulated that Tom's Marine put forth a good faith effort, albeit unsuccessful, to salvage the SO.

22

As to two preliminary issues raised in miscellaneous pretrial briefings but addressed sparingly, if at all, in trial, the Court finds that Thuan Tran signed in her capacity as a representative of T&P.  On both contracts, she signed as "agent of owner."  The undisputed owner of the SO is T&P.  The Court also finds that it was not established that Thuan Tran signed this contract under duress.

The parties did not provide any discussion as to whether Louisiana law or general maritime law should apply to the interpretation of the salvage contracts at issue.  Under either framework, the result would be the same.  The Court must first look to the written language of the contract to discern the intent of the parties.  *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981); La. C.C. art. 2046.  Only if that language is found to be ambiguous, or to lead to absurd consequences, may the Court take into account additional evidence of the intent of the contracting parties – such as their testimony regarding their understanding of the contractual terms.  *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, No. 12-968, 2014 WL 6698291, at *1, n.3 (E.D. La. Nov. 26, 2014) (citations omitted) (noting the application of such rules under general maritime law via interstitial adoption of Louisiana law).

The Court finds the second contract inapplicable here.  Two conditions would have triggered its effect – the vessel being unsalvageable and a "settlement out of court."  While the vessel

was ultimately found to be unsalvageable, the lawsuit was not "settled out of court," and thus the application of this second contract was not triggered.

The first contract therefore governs the parties' agreement. The Court finds that the phrase "due at the settlement of the lawsuit" is both ambiguous and would lead to absurd consequences. This phrase contemplates a definite conclusive moment – a characteristic of a lawsuit itself but certainly not a characteristic of an amicable settlement out of court. The Court finds uncertainty as to whether this phrase was intended to mean the sum became due merely at the conclusion of the lawsuit or that it would become due only if there was an amicable resolution. The Court further notes the absurdity of the conclusion of accepting the latter proposition. For example, in this case, the parties took part in a settlement conference before the magistrate judge *after* the conclusion of the trial. (Rec. Doc. 128). Under the latter reading, if the parties reached an agreement, even after trial, Tom's Marine would be entitled to compensation; if instead the Court issued an opinion, Tom's Marine would be entitled to $0.

The Court now turns to consider the parole evidence to further discern the intent of the parties. *In re Oil Spill*, 2014 WL 6698291, at *1 (noting the propriety of such consideration once ambiguity or absurdity has been established). Thuan Tran testified at trial. She unequivocally stated that there is still an outstanding balance on the contract of $120,000. When asked

24

further, she explained that she has not paid yet because she has been waiting for the Court's decision in the case.

The Court finds that the parties intended the phrase "due at the settlement of the lawsuit" to indicate that the amount became due once the lawsuit had concluded.  As further support for this position, the Court notes that the second contract uses the language "settlement out of court," which denotes that the parties were able to specify such a scenario when they wished to do so and deliberately chose to not use such language in the first contract. Relatedly, while it is true that there are "no cure / no pay" salvage arrangements, the advent of salvage contracts was largely to protect salvors from just such a scenario when unintended.  *See* R. Ethan Zubic, *Pure Versus Contract Salvage: Narrowing the Scope of an "Agreement to Volunteer" Bar to Pure Salvage*, 10 Loy. Mar. L.J. 145, 146 (2011).  For this reason, the failure to state in the first contract, either expressly or impliedly, that this was a "no cure / no pay" arrangement intimates that the parties' intent was in fact the opposite.  *C.f.* 2 Thomas J. Schoenbaum, Admiralty And Maritime Law § 16-1 (5th ed. 2014).  Thus, T&P owes Tom's Marine $120,000.

**e.  Spill Response**

ACO was instructed by the United States Coast Guard to provide a preventative oil spill response due to the collision.  ACO in turn hired Environmental Safety & Health, Inc.  In return for their services, ACO paid $81,836.09.  The Court finds this to be a reasonable amount.  ACO is entitled to recover from T&P, or rather

to offset the amount due to T&P, the sum on this contract proportionate with T&P's liability.

**f. Personal Property of Trinh Tran and Lanh Tran; Fuel, Ice, Bait, etc. on the SO**

Plaintiffs did not sufficiently carry their burden on proving damages as to the lost property of Trinh Tran and Lanh Tran or the loss of supplies on board the SO at the time of collision.

As to the personal property claims, Trinh Tran offered only his own testimony, stating that he lost a "diamond ring . . . worth $3800," a "Movado brand" watch that he purchased for $2200, and a "one carat gold" necklace that he bought for $950. Similarly, Lanh Tran offered his testimony that he lost a "necklace [of] about 2.5 carats with a value worth [$]1760, a ["Longines"] watch worth . . . . [$]1100, and [an] iPhone . . . [worth] $200." He also testified that he had a suitcase with various items totaling "around 200 to $300" in value. Finally, testimony as to value of any fuel, ice, bait, and other supplies on board the SO remained at only the broadest and vaguest level – "I went to get the fuel and the supplies, I paid 22,000 plus . . . ." Plaintiffs did not offer any corroborating evidence to establish their loss – no expert testimony, no evidence of purchase, no further descriptions of the items, original price, market value, condition at loss, or age. This purely conclusory statement does not constitute evidence to substantiate their claim.

While in some cases the uncontroverted testimony of the

plaintiff is sufficient to satisfy his burden of proof, he must provide some degree of specificity, including details about value, description, place of purchase, and price of purchase. *See, e.g., Cho v. Royal Oldsmobile Co., Inc.*, 722 So.2d 1138, 1142 (La. App. 4 Cir. 1998). Having weighed the credibility and the specificity of the Plaintiffs's testimony on these items, and noting the vague nature of this testimony and the implausibility that individuals would choose to bring fine jewelry on a fishing trip, the Court finds that they did not carry their burden of proof and thus denies the recovery for lost property as claimed by the Plaintiffs. However, given that Plaintiffs did not intend for the voyage to be merely a day trip, the Court does find it established that Plaintiffs lost some personal property. Accordingly, the Court finds it reasonable to award Trinh Tran and Lanh Tran $250 each for lost personal property.

## II.  CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333, which confers on the federal courts original jurisdiction over admiralty and maritime claims. Venue is proper in this district and is not contested.

### a.  Liability

"The standard of care in maritime cases is derived from general concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and usages." *Tokio Marine and Fire Ins. Co., Ltd. v. M/V Flora*, no. 97-1154,

1999 WL 14000, at *10 (citing *Schoenbaum*, § 14-2 at 255).   The
International Regulations for Preventing Collisions at Sea
("COLREGS"), 33 U.S.C. § 1602, et seq., governed the operations of
the vessels at the time of the collision.   To determine liability,
even in a comparative fault case, the *Pennsylvania* Rule applies: "a
vessel shown to be in breach of a statute or regulation has the
burden of proving not only that [t]he fault probably was not one of
the contributory causes but that it could not have been."   *Id.*
(citing *The Pennsylvania*, 86 U.S. 125 (1874); *Otto Candies, Inc. v.
M/V Madeline D.*, 721 F.2d 1034, 1036 (5th Cir. 1983)).   In other
words, "[T]he burden of proof is shifted as to the causation issue
once it is established that the vessel violated the statute or
regulation." *Id.*   (citing *Garner v. Cities Serv. Tankers Corp.*,
456 F.2d 476, 478 (5th Cir. 1972)).

COLREG 2 (Responsibility) provides,

"(a) Nothing in these Rules shall exonerate any vessel, or the
owner, master, or crew thereof, from the consequences of any
neglect to comply with these Rules or of the neglect of any
precaution which may be required by the ordinary practice of
seamen, or by the special circumstances of the case.

"(b) In construing and complying with these Rules due regard
shall be had to all dangers of navigation and collision and to
any special circumstances, including the limitations of the
vessels involved, which may make a departure from these Rules
necessary to avoid immediate danger."

COLREG 5 (Lookout) provides, "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

COLREG 6 (Safe Speed) provides, "Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.   In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(I) The state of visibility;

(ii) The traffic density including concentrations of fishing vessels or any other vessels;

(iii) The manageability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

(iv) At night, the presence of background light such as from shore lights or from back scatter from her own lights;

(v) The state of wind, sea and current, and the proximity of navigational hazards;

(vi) The draft in relation to the available depth of water.

(b) Additionally, by vessels with operational radar:

　　(I) The characteristics, efficiency and limitations of the radar equipment;

　　(ii) Any constraints imposed by the radar range scale in use;

　　(iii) The effect on radar detection of the sea state, weather and other sources of interference;

　　(iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

　　(v) The number, location and movement of vessels detected by radar;

　　(vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity."

COLREG 7 (Risk of Collision) provides, in part,

"(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

"(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

"(c) Assumptions shall not be made on the basis of scanty

30

information, especially scanty radar information."

COLREG 8 (Action to Avoid Collision) provides, in part, "Any action taken to avoid collision shall be taken in accordance with Rules 4-19 and shall if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship."

COLREG 11 (Applicability) provides, "Rules 11-18 apply to vessels in sight of one another."

COLREG 15 (Crossing Situation) provides, in part, "When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel."

COLREG 18 (Responsibilities Between Vessels) provides, in part, "Except where Rules 9, 10, and 13 otherwise require:

(a) A power-driven vessel underway shall keep out of the way of:

    (I) a vessel not under command

    (ii) a vessel restricted in her ability to maneuver;

    (iii) a vessel engaged in fishing."

COLREG 19 (Conduct of Vessels in Restricted Visibility) provides, in part,

"(a) This Rule applies to vessels not in sight of one another when navigating in or near an area of restricted visibility.

(b) Every vessel shall proceed at a safe speed adapted to the

prevailing circumstances and conditions of restricted visibility. A power-driven vessel shall have her engines ready for immediate maneuver.

(c) Every vessel shall have due regard to the prevailing circumstances and conditions of restricted visibility when complying with Rules 4-10."

COLREG 34 (Maneuvering and Warning Signals) provides, in part, "When vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. [ Such | This ] signal may be supplemented by at least five short and rapid flashes."

COLREG 35 (Sound Signals in Restricted Visibility) provides, in part, "In or near an area of restricted visibility, whether by day or night the signals prescribed in this Rule shall be used as follows:

(a) A power-driven vessel making way through the water shall sound at intervals of not more than 2 minutes one prolonged blast."

Both parties to the collision called expert witnesses to testify on their behalf. Plaintiffs called Captain Robert Munger. Defendants called Captain Ronald Campana.

Applying the rules and legal principles cited above, the Court

32

finds that both vessels were at fault in the collision.  The Court thus turns to the task of allocating liability.  *See United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 410-11 (1975) ("[L]iability . . . is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.").

With respect to the SJW, the captains violated the rules of the road and the ordinary practice of seamanship by piloting their vessel at 9 knots in conditions of restricted visibility. Moreover, they steered the vessel primarily by radar with the autopilot engaged, despite Captain Sears' knowledge that both decisions were not ordinary practice for daytime operations in restricted visibility.  Ex. 12, at 362-64.  The captains also knew that vessels of primarily fiberglass or wood constructions would not appear on their radar.  *E.g.*, Ex. 4 at 81-82; Ex. 12, at 53. They did not post a lookout nor did they sound a foghorn.  The SJW thus failed to use all available means to determine if a risk of collision existed, failed to conduct itself with due regard to the prevailing circumstances and conditions of restricted visibility, and made assumptions on the basis of scanty information. Collectively, the actions violated the ordinary practice of seamen

and violated COLREGS 2, 5, 6, 7, 8, 19, and 35.[5]  The Court has considered the other alleged violations but finds that Plaintiffs have not established the SJW's violation of those rules.

With respect to the SO, the captain neither sounded a foghorn nor regularly communicated its position via radio.  He also did not make proper use of the SO's radars, as the SO failed to detect the SJW and failed to engage in long-range scanning.  The violations establish that the SO failed to conduct itself with due regard to the prevailing circumstances and conditions of restricted visibility.  Collectively, these actions violated the ordinary practice of seamen and violated COLREGS 2, 7, 19, and 35.

The SO was not required to have radar on board.  *See* 46 C.F.R. § 28.300 ("Applicability) (explaining that the requirements of that subpart, including the requirement of having radar on board, only apply to commercial fishing vessels that, among other things, have crews of more than 16 individuals).  However, COLREG 7 includes within its ambit all vessels which have radar, not only those which are required to have it.  The SO violated COLREG 7 insofar as it was not using its radio and was not using its radar for long-range scanning.  The SO also failed to make proper use of this radar, by operator control or by defect, as it did not pick up a 205 x 44 foot metal crew boat; no other explanation was offered for not

---

[5] The Court finds COLREG 34(d), the "danger signal," to be irrelevant to analysis of either party's liability as the Court finds such signaling would have had no effect on avoidance of the collision, *i.e.*, causation.

detecting such a large, metal target.

The Court finds that Defendants failed to establish any other violations on the part of the SO. Defendants presented insufficient evidence for a finding that the SO violated COLREGS 5, 6, or 8.

The testimony was inconclusive as to whether SJW was properly using its radar. It is clear that they were attempting long range scanning, as the testimony established that the radars were set at 3 and 6 mile ranges. It is also clear that radars frequently have difficulty picking up vessels that are of a primarily non-metallic structure, as was the SO. However, the SO did have some metal rigging. Additionally, Captain McDonald testified that the SO had a radar reflector. No details were provided as to the size or angle of the radar reflector. Therefore, it is impossible to determine if the radar reflector was of such a size or so positioned that the SJW should have picked it up if operating its radars correctly. Although Captain Munger did testify that the SJW should have been able to detect the SO as radars can normally pick up sea buoys, which are of a smaller construction, Captain Campana undermined the importance of this observation in pointing out that sea buoys are specifically set up and designed to be picked up on radars, whereas the size and position of the SO's radar reflector would be determinative factors for its effectiveness. Camapana testified only that improper operation was one of several possibilities for why the SJW did not pick up the SO. The Court

also received deposition testimony of Jeffrey Frankel, captain of the M/V K MARINE VI, a similarly-sized supply vessel following shortly behind the SJW until the vessels reached the Gulf. Captain Frankel stated that he also did not pick up the SO on his radar. This undermines the importance of Trinh Tran's testimony that yet another vessel contacted the SO on its own initiative, implying that the vessel must have picked up the SO on its radar. That one vessel could pick up a fishing vessel of primarily fiberglass construction, but two vessels could not, does not establish that the two vessels had defective radars or were using their radars improperly.

Plaintiffs did not carry their burden to show that their failure to regularly communicate their position or their failure to sound a foghorn could not have been one of the contributory causes of the collision. Captain McDonald did state that he did not think Trinh Tran would have been able to understand him even if they had communicated on the radio. In response to questions about whether he heard any foghorns, Captain McDonald stated that with "six 3516 screaming diesel engines . . . you [sic] not going to hear that" and then "[t]hat would have been pretty tough to hear [depending on the equipment]." Both experts unequivocally testified that the F/V STAR OCEAN should have been doing both. Captain Campana testified that although he has not been on the SJW, he has been on sister ships owned by ACO, and that they can pick up "a tremendous amount [of noise from the outside]." There was no expert testimony that,

36

based on the sound devices of the SO and the auditory conditions aboard the SJW, a sound signal from the SO could not be heard on the SJW.  Furthermore, Captain Sears was piloting the SJW during the time leading up to the collision, not Captain McDonald, and he stated no such opinions.

Based on the above findings of fact and conclusions of law, the Court finds that the M/V ST. JOSEPH THE WORKER was 75% at fault and the F/V STAR OCEAN was 25% at fault for the collision and the damages should be apportioned in these percentages.[6]

### b.  Summary of Damages and Interest

All amounts below have been reduced, where appropriate, to an apportionment of damages consistent with this Court's finding of

---

[6] Plaintiffs also argue in pre-trial motions and their post-trial briefing that the Court should apply the doctrine of unseaworthiness in finding liability on part of ACO, thus holding ACO to this doctrine's stricter standard.  The doctrine of unseaworthiness as applied in the Fifth Circuit operates only in actions by the injured against the employer / owner of the vessel on which he worked (or in other limited scenarios not at issue here). *Smith v. Harbor Towing & Fleeting, Inc.*, 910 F.2d 312, 314-315 (5th Cir. 1990); *Coakley v. SeaRiver Maritime, Inc.*, 319 F. Supp.2d 712, 714 (E.D. La. 2004) ("The duty of seaworthiness is an absolute and non-delegable one which 'the *owner* of a vessel owes *to the members of the crew who man her*.' *United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 616 (1959) ([emphasis in district court citation]); *see Brister v. A.W.I., Inc.*, 946 F.2d 350,355 (5th Cir. 1991).  Thus the plaintiff must establish that he is a seaman, a crew member, with respect to the barge on which his injury occurred . . ., and that the defendant was the owner of the vessel."); *In re Diamond B. Marine Srvcs., Inc.*, no. 99-1346, 2001 WL 1164914, at *14 (E.D. La. Sept. 28, 2001) (Clement, C.J.) ("Because they were not crewmembers of the CANE RIVER, the claimants have no right to pursue unseaworthiness claims against Trico as a matter of law.")(citations omitted); CHARLES M. DAVIS, MARITIME LAW DESKBOOK 215 (2010 ed.)(reviewing the related caselaw; *see also* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6-27 (5th ed. 2014).  Thus, the doctrine is inapplicable here.  Further, it was not established that the training of the SJW's captains fell below the standard of care of any duty that ACO might have owed to the crew of the SO.

apportionment of liability.

1.   T&P – $84,540.98 to be paid by ACO ($140,000, the cost of the salvage contract, reduced by 25% to reflect apportionment of liability and then offset by $20,459.02, the amount owed to ACO on the preventative oil spill response cost).

2.   Tom's Marine – $120,000 to be paid by T&P.

3.   ACO – $20,459.02 (T&P's liability for the preventative oil spill response cost) to be offset against the amount owed by ACO to T&P as included in calculation above.

4.   Trinh Tran – $145,471.15 total ($193,961.53 reduced by 25%, consisting of $69,922.25 in lost wages; $23,789.28 in past medical expenses; $100,000.00 in general damages; and $250.00 in lost property).

4.   Lanh Tran – $69,227.05 total (consisting of $13,067.05 in lost wages; $5910.00 in past medical expenses; $50,000.00 in general damages; and $250.00 in lost property). Defendants are liable for $51,920.29, or 75%, of this total.

Both Plaintiffs and Intervenor argue that they are entitled to prejudgment interest. Prejudgment interest is available in admiralty cases to compensate the plaintiff for the use of funds to which he was rightfully entitled. *Brister*, 946 F.2d at 362 (quoting *Noritake Co. v. M/V HELLENIC CHAMPION*, 627 F.2d 724, 728 (5th Cir. 1980)). It is available as a general rule for past damages. *Id.* However, the Court in its discretion may deny prejudgment interest where peculiar circumstances would make such

38

an award inequitable. *Reeled Tubing, Inc. v. M/V Chad G.*, 749 F.2d 1026, 1028 (5th Cir. 1986) (citing *Inland Oil & Transport Co. v. Ark-White Towing Co.*, 696 F.2d 321, 327 (5th Cir. 1983). "Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff." *Id.* (citations omitted).

The Court finds that it would be inequitable to award prejudgment interest to Plaintiffs due to the peculiar circumstances of this case. This case had two trial dates set shortly after the incident, both of which were continued on motion by Plaintiffs over objections of Defendants. Furthermore, as evident from the trial and this Court's analysis, both parties had good faith claims and both have been found to be at fault. Finally the damages awarded are substantially less than those claimed. *See, e.g., Comar Marine, Corp. v. Raider Marine Logistics, LLC*, nos. 13-30156, 13-30819, 2015 WL 4079541, at *10 (5th Cir. 2015)(affirming denial of prejudgment interest on the last factor); *St. James Stevedoring Partners, LLC v. Motion Navig. Ltd.*, no. 13-0541, 2014 WL 3892178, at *19 (E.D. La. Aug. 6, 2014)(denying prejudgment interest on these last three factors).

Intervenor is also not entitled to prejudgment interest. This Court has found that the balance of the salvage contract became due

39

at the conclusion of this litigation.  As this order and its accompanying judgment marks the end of the litigation, there is no "prejudgment injury" from which prejudgment interest may accrue.

Post-judgment interest and costs are owed in accordance with the applicable statutes.

July 27, 2015

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE